UNITED STATES of America

v.

Robert A. LEBOVITZ, Appellant.

No. 81–1612.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule
12(6) Oct. 26, 1981.

Decided Jan. 21, 1982.

Certiorari Denied April 19, 1982.
See 102 S.Ct. 1979.

See also, D. C., 506 F.Supp. 249.

James K. O'Malley, Pittsburgh, Pa., Herbert B. Lebovitz, Pittsburgh, Pa., for appellant.

Robert J. Cindrich, U. S. Atty., Paul J. Brysh, Frederick W. Thieman, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Robert Lebovitz was convicted of thirteen counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. The indictment alleged a conspiracy between Lebovitz, a lawyer, and others to defraud insurance companies. The government evidence showed that Lebovitz and another lawyer in his firm, Lewis Kwall, conspired to submit inflated medical bills to insurance companies in connection with claims made on behalf of Lebovitz' clients for payment of their medical expenses and for compensation for their personal injuries. Fraudulent medical bills were provided by Dr. Jack H. Pincus. The jury convicted Lebovitz on all charges alleged in the indictment. He was sentenced to concurrent prison terms of one year and one day, and was fined a total of $14,000 plus costs of prosecution.

On appeal, he raises several issues including: (1) whether the mailings charged and proven in Counts 5, 10, 13 and 14 were sufficiently related to the fraudulent scheme to support the mail fraud convictions on those counts; and (2) whether the district court erred in admitting the testimony of a prosecution witness under Federal Rule of Evidence 404(b) without an express determination that its probative value outweighed its prejudicial effect. We affirm.

### I.

#### Mail Fraud

The mail fraud statute prohibits the use of the mails "for the purpose of

executing" a scheme to defraud.[1] 18 U.S.C. § 1341. Whether a mailing is "for the purpose of executing a scheme" within the meaning of § 1341 depends upon whether it is "sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Brown*, 583 F.2d 659, 664 (3d Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). The completion of the scheme must depend in some way on the mailings charged. *United States v. Brown*, 583 F.2d at 664; *United States v. Tarnopol*, 561 F.2d 466, 472 (3d Cir. 1977). However, "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), *quoted* in *United States v. Maze*, 414 U.S. at 400, 94 S.Ct. at 648. Rather, it is sufficient if the mailing is "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. at 8, 74 S.Ct. at 362. *See United States v. Adamo*, 534 F.2d 31, 36 (3d Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976) ("It is enough that the use of the mails merely furthers the scheme...."); *United States v. Giovengo*, 637 F.2d 941, 944–45 (3d Cir. 1980), *cert. denied*, 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981) (applying *Pereira* test to wire fraud statute).

Use of the mails after the object of the scheme has been accomplished is not sufficiently closely related to the scheme to support a mail fraud conviction. *United States v. Brown*, 583 F.2d at 664. However, the object of a scheme is not necessarily accomplished at the moment when the perpetrator of the fraud receives the fruits of the scheme. *Id.* In some cases, subsequent mailings may still be "for the purpose of executing" the scheme because they are, for example, "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Maze*, 414 U.S. at 403, 94 S.Ct. at 650. *See United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136 (1962).

In the counts which Lebovitz does not challenge as insufficient to support the mail fraud charges, the mailings generally related to the claims presented by Lebovitz on behalf of his clients for medical payments and personal injuries. In the four counts which are challenged, Counts 5, 10, 13 and 14, the mailings were related to third-party claims asserted by the original defendants against the plaintiff drivers alleging the drivers were totally or partially liable for the injuries to their own passengers. The plaintiffs' liability carrier, not Lebovitz, represented the plaintiff drivers as third party defendants.

Lebovitz contends that all of the claims involved in his scheme "were directed to either the medical payment carrier or the liability carrier representing the original defendant" and therefore the mailings in the four challenged counts were not closely enough related to the scheme to bring the conduct within the statute. Brief for Appellant at 20. Thus, we must decide whether the mailings in connection with the third-party complaints can support the mail fraud convictions on those counts. We must view

---

1. Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

the evidence in the light most favorable to the government. *United States v. Brown,* 583 F.2d 659, 661 (3d Cir. 1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 89 L.Ed. 680 (1942).

*Counts 10, 13 and 14.*

These counts alleged three mailings arising out of an accident between John Sochacki, the driver of one car, and Michael Joyce, driver of the second car. Lebovitz represented Sochacki and his passenger, Joan Posa, in their medical payment claims against Sochacki's own insurer, J.C. Penney Insurance Company, and in their personal injury suit against the driver of the other car, Michael Joyce, who was represented by Allstate Insurance Company. The medical payment claims were based on the inflated medical bills from Dr. Pincus and the damages claimed in the personal injury suit also included those bills. Joyce, through his insurer, Allstate, joined Sochacki as an additional defendant on the Posa claim. Sochacki's insurer, J.C. Penney, defended this third-party claim. The evidence at trial showed that J.C. Penney paid Sochacki $985.20 and Posa $1,701.23 on their medical payment claims; that Allstate settled the personal injury claim of Sochacki for $1,000 and of Posa for $3,000; and that J.C. Penney paid Posa $1,000 on behalf of third-party defendant Sochacki.

The mailings used to support the mail fraud charges were letters between Lebovitz' law firm, representing Sochacki and Posa as the original plaintiffs, and the attorney for J.C. Penney, representing Sochacki as the additional defendant on the Posa claim. To support Count 10, the government relied on a letter from Kwall, of Lebovitz' law firm, to J.C. Penney's attorney enclosing Sochacki's and Posa's Pretrial Statement which consisted of a list of special damages including the inflated medical bills. Government Trial Exhibit XI(I). Count 13 was supported by a letter from Lebovitz to J.C. Penney's attorney in connection with the settlement, and included Posa's releases of Sochacki, defendant in the third-party claim, for the $1,000 settlement from J.C. Penney on behalf of Sochacki. Government Trial Exhibit XI(L). Count 14 was supported by a letter from J.C. Penney's attorney to Lebovitz enclosing the $1,000 settlement check. Government Trial Exhibit XI(M).

■ Lebovitz argues that there is no evidence that the joinder of the additional defendant or the recovery of money from an additional defendant was within his contemplation or part of the scheme or that the success of the scheme depended upon the mailings to or from the attorney for the additional defendant. However, the relationship between the personal injury claim filed by Lebovitz for his clients Posa and Sochacki and the third-party claim filed by defendant's insurer against Sochacki is apparent from the mailing which showed that Lebovitz negotiated and processed at the same time the settlement from Allstate for Posa and Sochacki as original plaintiffs and the settlement from J.C. Penney on behalf of Posa against Sochacki. Further, there was sufficient evidence for the jury to find that at the time of the settlement negotiations, Lebovitz' damages claims were still based upon, in part, Dr. Pincus' inflated bills. Thus, the jury could have concluded that at the time of the mailings charged in Counts 10, 13 and 14 Lebovitz was attempting to fraudulently obtain money from both the original defendant's insurer and the additional defendant's insurer, that the object of his scheme had not yet been fully accomplished, and that the mailings furthered the resolution of the third-party claims. The scheme "depended" in that way upon the mailings for its furtherance. *See United States v. Brown,* 583 F.2d at 664; *United States v. Adamo,* 534 F.2d at 36.

■■ Lebovitz' contention that he never controlled or contemplated the joinder of additional defendants is also without merit. The law is clear that "one 'causes' the mails to be used where he 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. . . .' "

*United States v. Maze*, 414 U.S. at 399, 94 S.Ct. at 648 (quoting *Pereira v. United States*, 347 U.S. at 8–9, 74 S.Ct. at 362–63). The evidence in the present case amply supports a finding that Lebovitz reasonably foresaw the joinder of additional defendants and subsequent mailings involving those defendants. In connection with one of the other claims, Lebovitz himself testified:

> I was asked does an insurance company in every instance join somebody as a third-party defendant. I said to you when they have a justification [sic] basis, they would join somebody as a third-party defendant, but its improper if they did it in every case.
>
> Now, if you are asking me on evaluation of this case was I shocked that Sharon Campbell was joined as an additional defendant, I wasn't shocked. This can happen.

App. 1203–04. The trial court gave, in substance, the charge requested by defense counsel. It instructed the jury:

> Use of the United States mails in furtherance of a scheme to defraud is an essential element of the offense charged. It is not necessary that the use of the mails by the defendant himself be contemplated, or that a defendant do any actual mailing or that a defendant specifically intends that the mails be used. It is sufficient if the use of the mails by somebody else, such as a doctor, lawyer, a claim agent, or an insurance company, was reasonably foreseeable in the preparation or settlement of an accident case in litigation.
>
> It is only necessary that the defendant could reasonably foresee that the mails would be used in furtherance of the scheme.
>
> The gist of the offense of mail fraud is the use of mails by someone to carry out some essential element of the fraudulent scheme or artifice.

App. 1324–25. Defendant does not contend that the charge was erroneous. We find that there was sufficient evidence from which the jury could have found the requisite nexus between the mailings and the conduct charged in Counts 10, 13 and 14.

*Count 5.*

The relationship between the scheme and the mailing relied upon to support Count 5 is less readily apparent. Lebovitz represented the driver, Sharon Campbell, and her mother, Anne Baumeister, a passenger in the car, when it was involved in an accident with a car driven by Louise Corradini in May, 1974. Both Campbell and Baumeister were covered by medical payment insurance with Nationwide Insurance Company, which provided that if they were injured in an automobile accident, Nationwide would pay their medical expenses regardless of fault or liability. Campbell also had separate liability coverage with Nationwide. Lebovitz sought recovery from Nationwide for the medical expenses of Campbell and Baumeister and, in this connection, he submitted the fraudulently inflated medical bills from Dr. Pincus. The medical payment claim was paid on December 16, 1974.

Lebovitz also represented Baumeister and Campbell in their personal injury claims against Corradini and filed suit on their behalf. INA, Corradini's insurance carrier, defended the suit. It filed a third-party claim to Baumeister's complaint joining Campbell as an additional defendant, on the ground that Campbell was totally or partially liable for Baumeister's injuries. Nationwide, not Lebovitz, defended the third-party claim for Campbell under the liability portion of her coverage.

The mailing used to support the Count 5 mail fraud charge was a letter dated August 18, 1976 from Nationwide's trial attorney to the Nationwide claims attorney enclosing Baumeister's answers to interrogatories, her itemized list of special damages which included an inflated medical bill from Dr. Pincus, and a copy of the inflated bill itself. Government Trial Exhibit X(J). Lebovitz argues that Nationwide's only continued interest in the case concerned the claim of the original defendant, Corradini, against the additional defendant, Campbell, which claim had been asserted by Corradini's attorney, not Lebovitz. Further, he

asserts, that because the object of Lebovitz' scheme was accomplished when he received the check of December 16, 1974, the mailing was not sufficiently related to the scheme to support a mail fraud conviction.

■ Lebovitz' argument is predicated on the assumption that no reasonable jury could find the necessary nexus between his scheme and the third-party complaint. However, as in the Sochacki/Posa claim, evidence on record supports such a nexus. Lebovitz continued to represent Campbell and Baumeister in their personal injury claims at the time the August 18, 1976 letter was sent, and their personal injury claims relied in part on Dr. Pincus' inflated medical bill. During the pendency of the personal injury claims, Lebovitz wrote a letter dated October 6, 1977 to trial counsel for Nationwide, the insurer of the third-party defendant, which stated, in part,

> I would appreciate your looking into this matter with Nationwide and advising me if you are in a position to offer a contribution on behalf of any negligence for Sharon Campbell in this matter, in order that we can attempt to amicably resolve this matter due to Mrs. Baumeister's condition.

Government Trial Exhibit X(K). Lebovitz' own testimony at trial supports a finding that the scheme was ongoing:

> LEBOVITZ: In your letter, you are asking me about Exhibit X–K, we were trying to get some money out of Nationwide if they would pay it, but they didn't want to pay it.
>
> PROSECUTOR: So you were trying to get money out of Nationwide Insurance,

so they still had an interest in the case, and you still had an interest that Nationwide was involved.

> LEBOVITZ: I can see they had some interest in the case as to Anne Baumeister. . . .

App. 1211.

Samuel A. Bruno, the Nationwide claims attorney to whom the August 18, 1976 letter was addressed, testified that his authorization was required before any settlement could be approved, App. 27; see App. 545, that medical payments are a factor in such settlement evaluations, App. 36–38, and that the inflated bill prepared by Dr. Pincus and transmitted to him with the August 18, 1976 letter became part of his permanent file and "helps us to try to evaluate the case for settlement" App. 44; see App. 546. Under these circumstances, we cannot hold as a matter of law that the mailing on August 18, 1976 relating to the third-party claim was not incident to an essential part of Lebovitz' scheme, which the jury could have viewed as settlement of all of the claims of Lebovitz' clients, and therefore sufficiently related to Lebovitz' scheme to support a mail fraud conviction.[2]

## II

### Admissibility of Dr. Rosenbloom's Testimony

Lebovitz contends that the court erred in admitting the testimony of Dr. Meyer Rosenbloom. Dr. Rosenbloom testified that at Lebovitz' request he had prepared inflated medical bills for services to Lebovitz' clients during the period from approximately 1970 to 1975.[3] Dr. Rosenbloom's testimony was

---

**2.** It is also possible that even if Lebovitz' contention were accepted that his scheme was complete upon receipt of the medical payments from Nationwide, Campbell's insurer, the jury nevertheless could have found that it continued as to INA, Corradini's insurer. As this court noted in *United States v. Brown*, "[a subsequent] letter to a victim may be used to aid a scheme which contemplated a series of fraudulent acts. In such a case, a mailing may be used to give a fraudulent business the appearance of legitimacy or otherwise to postpone inquiry and action by former victims so that the scheme may continue." 583 F.2d at 664

(citations omitted). Thus the letters involving Nationwide could have aided Lebovitz in his next fraudulent act in a series, which was the personal injury claim against the original defendant's insurer based upon the same inflated medical bills.

**3.** Dr. Rosenbloom testified in part:
Q Who indicated to you that the bill should be inflated?
A The word inflation never occurred to me, but that is what we were doing. But I would say I have a bill for $150, and [Lebovitz] would say something that the patient may

particularly significant because Dr. Rosenbloom testified to direct contact with Lebovitz, unlike Dr. Pincus, whose direct contact was with Kwall. Because the acts to which Dr. Rosenbloom testified were outside the period of the statute of limitations, they were not relied upon by the government to support the conviction.

In response to defendant's objection to the admission of Dr. Rosenbloom's testimony, the government offered that testimony under alternate theories of admissibility—that the testimony would be connected to the alleged conspiracy, App. 76–86, or that it was admissible under Rule 404(b) of the Federal Rules of Evidence "to show that the defendant had knowledge of the scheme and that he carried it out with other individuals and shows intent and is a hundred percent probative in that regard of doing the same thing with other people and indicates that the scheme charged in the indictment did, in fact, exist." App. 87. The court recessed and then overruled the defendant's objections to the admissibility of Dr. Rosenbloom's testimony without giving a specific reason. App. 89–90. Defendant requested no limiting instruction.

Three trial days thereafter the court stated that since the defendant failed to ask for

have said he had come more frequently and that a bill for $350 was necessary, or was inferred or implied by the patient.
Q [Lebovitz] would indicate to you the amount to put on your bill?
A Yes.
App. 98.

\* \* \* \* \* \*

Q Who would make the determination as to whether the bill would be inflated or not?
A Mr. Lebovitz.
Q And during the discussions were you aware of what basis he was making to make that decision?
A No.
Q Would he indicate to you the type of accident involved or the seriousness of the injury, something like that?
A No, not really. It was just that he would say there would be $350, this one is $400.
App. 105–06

\* \* \* \* \* \*

Q Would you have indicated to the defendant the number of visits that the patient had actually been seen?
A Would I?
Q Yes.

a bill of particulars to identify the other conspirators, the court would ask the government who the other persons were. In response, the government stated that the evidence would support an instruction limiting the conspiracy to Lebovitz, Kwall, and Dr. Pincus, "and that the government is prepared to request or recommend to the Court that limited [sic] instructions be given to the jury that the testimony of Dr. Meyer A. Rosenbloom is admitted for a limited purpose under Rule 404(b) of the Federal Rules of Criminal Procedure [sic] bearing on the question of intent or knowledge of the defendant insofar as the scheme carried out as charged in the mail fraud indictment, but that the testimony of Dr. Meyer A. Rosenbloom is not to be considered with respect to whether the defendant actually conspired with Meyer A. Rosenbloom to violate the conspiracy act as charged." App. 806–07. No limiting instruction was given at that time, and the trial continued.

At the conclusion of the testimony defendant moved for a mistrial based on the admission of the testimony by Dr. Rosenbloom, which was denied. Lebovitz argues on appeal that since the government con-

A Yes.
Q And would Attorney Lebovitz then suggest to you that you inflate the amount of money and number of visits?
A Arrive at a figure, yes.
Q How would you know what dates to put down for the visits?
A We just picked them off the calendar.
Q We? Who do you mean?
A Mr. Lebovitz and I.
Q He would indicate to you dates and you would put them down?
A Many times.
App. 106–07.

As to one accident, Dr. Rosenbloom testified that he actually treated the patient on two visits, but the report and bill which he prepared in concurrence with Lebovitz indicated 28 treatments. App. 116–18. On another occasion, he treated a patient on one visit, but after he received a letter from Lebovitz which stated, *inter alia*, "I understand you have been treating Carlton [the patient] frequently and that he has seen you approximately thirty-five times since December 12, 1970," Dr. Rosenbloom prepared a bill indicating 39 visits. App. 121–24.

ceded that Dr. Rosenbloom could not be connected to the conspiracy with Lebovitz and Dr. Pincus, the only basis for admitting Dr. Rosenbloom's testimony was under Rule 404(b), and that the court's failure to make an express balancing on the record under Rule 403 that the probative value of the evidence outweighed its prejudicial effect compels a reversal.

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 403 of the Federal Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ In *United States v. Long*, 574 F.2d 761, 766 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978), this court considered whether the trial court's admission of evidence without making explicit the balancing required under Rule 403 required a reversal. In considering the appellant's claim, we noted that the trial court is given a very substantial discretion in balancing "probative value" on the one hand and "unfair prejudice" on the other. *Id.* at 767. Judge Adams, in his concurring opinion, expressed his concern that the trial court's failure to balance on the record made it difficult for an appellate court to determine whether there has been an exercise of discretion or a mistake. *Id.* at 770. The majority in *Long* also agreed that "[w]here an objection does invoke Rule 403, the trial judge should record his balancing

analysis to the extent that his exercise of discretion may be fairly reviewed on appeal." *Id.* at 766 (footnote omitted). In this case, although appellant's counsel did not expressly refer to Rule 403 by name, he nonetheless did argue that the testimony was prejudicial and thus it is evident to us that this was an appropriate case in which the trial court should have articulated the factors considered in balancing the probative value against the unfair prejudice.

■ When faced with the failure of the trial court to undertake the articulated balancing which this court has on numerous occasions directed, *id.; see United States v. Provenzano*, 620 F.2d 985, 1003 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980) (in context of Rule 609 balancing), we have followed two paths. In some instances we have determined that the trial court implicitly made the requisite balancing. *See United States v. Provenzano*, 620 F.2d at 1003. In other instances, we have undertaken to examine the record ourselves. *See Carter v. Hewitt*, 617 F.2d 961, 972–73 (3d Cir. 1980). We reiterate that such balancing should be performed in the first instance and on the record by the trial court who is in the best position to determine the weight to be given the various relevant factors.[4]

■ In this case it is apparent that the trial court considered that Dr. Rosenbloom's testimony was highly probative of the defendant's intent. In its subsequent analysis of the admissibility of such evidence when ruling on the motion for a mistrial, the trial court rejected defense counsel's contention that Dr. Rosenbloom's testimony was admitted because of the conspiracy charge. The court stated, "He was testifying as to the defendant's intent. For years, he kept inflating bills and continued to do it for Dr. Pincus. That was the only purpose that I could see." App. 1285. In light of Lebovitz' assertions throughout the trial that he had not dealt directly with Dr. Pincus and

---

4. We also suggest that the Assistant United States Attorneys who proffer the challenged evidence should call to the attention of the trial court the need to make explicit on the record the requisite balancing.

that he had not known that the medical bills were inflated when he used them, *see, e.g.,* App. 978–79, 1066, 1070–71, Lebovitz' knowledge and intent with regard to inflated medical bills used to support the claims of his personal injury clients clearly had probative value as to his state of mind in dealing with Dr. Pincus. We see no reason why admission of such evidence would be "unfair", *see Carter v. Hewitt,* 617 F.2d at 972–73, since the time periods during which Drs. Rosenbloom and Pincus submitted their inflated bills were not far apart and the *modus operandi* in connection with each was not so dissimilar as to cause the jury to base its decision on extraneous factors. Therefore, we cannot say that the trial court erred in admitting Dr. Rosenbloom's testimony.

We have carefully considered the other contentions raised by Lebovitz, that the evidence which showed two unrelated conspiracies fatally varied from the indictment which charged a single conspiracy, that the warrant for the search of Lebovitz' office was issued without sufficient probable cause and was a general search in violation of the Fourth Amendment, and that the indictment should have been dismissed because the prosecutor failed to produce evidence negating guilt to the grand jury, and have concluded that none of them present any basis for reversal of the judgment of conviction.

For the foregoing reasons, we will affirm the judgment of the district court.

ADAMS, Circuit Judge, concurring.

While I concur in Judge Sloviter's opinion, I write separately to emphasize my concern regarding the continuing uncertainty in the application of Federal Rule of Evidence 403. The rule, which accords the trial court discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," is often used in conjunction with Rule 404(b) to admit potentially prejudicial evidence of prior "bad acts." *See United States v. Cook,* 538 F.2d 1000, 1003–04 (3d Cir. 1976). Admittedly, the realities of trial

preclude a detailed exegesis by the trial judge of the decision to admit or exclude relevant, prejudicial evidence. But the *exercise* of a judge's discretion requires just that—exercise, application, overt action. Thus, as I urged in *United States v. Long,* 574 F.2d 761 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978), and as the majority suggests here, the trial court should make certain that in ruling on an objection premised on Rule 403, the record reflect "some reckoning of the balance between relevance and prejudice and the alternatives available for the substitution of less prejudicial proof." *Id.* at 770. This is an oft-repeated admonition, not only in our Court, but in a number of other circuits as well. *See, e.g., Miller v. Poretsky,* 595 F.2d 780, 794 & n. 40–41 (D.C.Cir.1978); *United States v. Dwyer,* 539 F.2d 924, 928 (2d Cir. 1976); *United States v. Robinson,* 530 F.2d 1076, 1081 (D.C.Cir.1976). *See generally* J. Weinstein & M. Berger, *Evidence* ¶ 403[02], at 404–14 to –15 (1980 & Supp.). The point bears reiteration in the case before us today.

Put simply, an appellate court should not be expected to strike the correct balance between prejudice and probativeness in the Rule 403 context. Such an analysis, at least when undertaken by an appellate court in the first instance, necessarily entails considerable after-the-fact speculation. For example, the view of the appellate judges may differ significantly from that of the trial judge, who can assess the credibility of the witnesses and the potential impact of their testimony, in light of the entire environment of the trial. Faced with a barren or inadequate record, however, an appellate court—unable to determine whether the trial judge has used, let alone abused, his or her discretion—has limited choices: it can reverse and remand the case, or it can engage in its own balancing process. Neither alternative is completely satisfactory. Both consume time and limited judicial resources, and, even more important, either choice may result in a misinformed judgment by the appellate court.

In the present case, there is an indication that, in ruling on the objection to Dr. Rosenbloom's testimony, the trial judge was exercising the discretion granted him under Rule 403. The testimony was preceded by a lengthy side bar conference between counsel and the trial judge. While Rule 403 was not mentioned by name, the defense attorney did state that the judge must "determine whether or not [the evidence] is prejudicial, and whether the prejudicial value outweighs the probative value...." Appendix at 87. After the conference, the court was recessed for ten minutes while the judge considered the issue. When the trial resumed, the judge announced his ruling, but did not explicitly set forth on the record either the probative worth of Dr. Rosenbloom's testimony or the possibility of unfair prejudice. From this, the majority concludes—and I cannot disagree—that the trial judge's decision was the result of a proper exercise of discretion.

The fact that the Court today is willing to infer from the record what preferably should have been made explicit at trial, however, does not obviate the risk that district judges take when they neglect to indicate, in some fashion, the basis for an evidentiary ruling under Rule 403. At best, the appellate tribunal is forced to second-guess the trial judge in such a situation. At worst, an improperly documented Rule 403 ruling may be cause for a reversal and remand. Accordingly, defense attorneys should clearly invoke Rule 403, either by name or by reference to its contents, when objecting to potentially prejudicial evidence. Trial judges likewise should indicate on the record that they have engaged in the requisite balancing process.

With this caveat I join in the opinion of the majority.