**UNITED STATES of America, Appellee,**

v.

**Joseph E. SHAMY, Appellant.**

**No. 80–5056.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1981.

Decided Aug. 13, 1981.

Rehearing and Rehearing En Banc
Denied Sept. 25, 1981.

R. Stan Mortenson, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., on brief), for appellant.

Gale E. Rasin, Asst. U. S. Atty. and Robert B. Schulman, Sp. Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, PHILLIPS, Circuit Judge, and MICHAEL,* District Judge.

HAYNSWORTH, Senior Circuit Judge.

Joseph Shamy, a lawyer practicing in New Brunswick, New Jersey, became deeply involved in the affairs of Laurel Harness Racing Association which conducted harness horse racing meets in Maryland. Out of that involvement, he, his wife and fa-

---

* Honorable James H. Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

ther-in-law were jointly indicted on charges of mail fraud, wire fraud and racketeering. Early in the protracted trial, however, a mistrial was declared as to his wife and father-in-law. The trial proceeded as to Shamy, and he was convicted on all seven counts with which he was charged, three for mail fraud in violation of 18 U.S.C.A. § 1341, three for wire fraud in violation of 18 U.S.C.A. § 1343, and one for racketeering in violation of 18 U.S.C.A. § 1962. He was sentenced to concurrent four-year terms of imprisonment, and a fine of $31,000 was imposed. On his appeal we find no reversible error.

## I.

Prior to 1974 Laurel was a public corporation with many stockholders. Its president, Richard Hutchinson, and members of his family, however, owned a majority of the outstanding shares. In that year Shamy and two of his clients, Joseph and Stephen Sobecko, began negotiating with Hutchinson for the purchase of a majority of the outstanding stock of Laurel.

The Maryland Racing Commission had been urging Hutchinson to effect substantial capital improvements at the racetrack. The prospective buyers were informed of this and, through Hutchinson, assured the Commission that they would construct a new club house and effect other extensive improvements at the track by the end of 1976. This led the Commission to make a contingent grant of additional racing days to Laurel.

In May, 1975 Shamy, the Sobecko brothers and Mike Brown purchased the Hutchinson stock and that of several other shareholders. The acquired stock represented 58% of Laurel's outstanding stock, and the purchase price was approximately $3,100,000. A loan from the Citizens Bank and Trust of Riverdale, Maryland to Shamy, his wife and the Sobecko brothers provided $2,200,000 of that amount, and the balance was due from the individual purchasers.

Shamy had some trouble raising his share of the purchase price. He raised some money by selling to Mike Brown the right to purchase one-half of his shares for a stipulated sum. He obtained $75,000 from Henry N. Stevens Company, a concessionnaire at Laurel, which Shamy treated as a personal loan to him but which Stevens treated as an advance to Laurel on their contract for the next racing meet. The remaining $110,000 Shamy obtained directly from Laurel's treasury. Shortly after Mike Brown began working at Laurel as secretary-treasurer, he discovered the $75,000 advance from Stevens and the $110,000 check to Shamy drawn on Laurel's account. When confronted with these matters by Brown, Shamy promised to repay the $185,000. Before doing so, however, in November, 1975 Shamy transferred his shares to the other three associates. His absence, if indeed he was absent, however, was shortlived.

Meanwhile, Shamy was encountering financial difficulties. He had a substantial ownership interest in Brunswick Burlington, Inc., which owned two low-rent apartment complexes in New Jersey. In the fall of 1975 that corporation was in default on its mortgage obligations to Commercial Trading Company of New York. Foreclosure was forestalled by an arrangement pursuant to which Catherine Lonski, Shamy's sister and Brunswick Burlington's bookkeeper, would disburse no funds from rental receipts without the approval of one of Commercial Trading Company's vice presidents. Nevertheless, Brunswick Burlington's financial condition continued to worsen, and foreclosure was an imminent threat throughout 1976 and 1977.

In March 1976 Shamy was again very much on the scene at Laurel. He arranged for Daniel Rizk, Shamy's father-in-law and the superintendent of one of Brunswick Burlington's apartment complexes for which he got the free use of an apartment and a weekly wage, to purchase from the Sobecko brothers and Mike Brown their 58% interest in Laurel. The financial arrangement is not clearly revealed in the record. We do know that Rizk agreed to pay the $2.2 million dollar loan to Citizens Bank and Trust and the officers' loans payable to Laurel, including Shamy's original $185,000.

A new board of directors was elected, consisting of Rizk, his daughter Greta, who was Shamy's wife, and Catherine Lonski, Shamy's sister. Some 73,000 shares were registered in Rizk's name, while qualifying shares were registered in the names of Mrs. Shamy and Mrs. Lonski. Shamy was neither director, officer or shareholder, but was to serve as Laurel's general counsel. The new board elected Rizk its chairman and Mrs. Shamy Laurel's president.

Difficulties immediately faced the new management. The annual stockholders meeting was held in April 1976 and the minority stockholders were upset about the disclosure in the September 30, 1975 audit report of the large amounts the Shamy group had withdrawn from Laurel in the form of loans, salaries, legal fees and administrative expenses. In March the Maryland Racing Commission gave notice that Laurel's racing days would be taken away if the promised improvements were not begun in two months and completed within a year.

Shamy undertook to act as the general contractor for the construction project, though he tried to conceal his identity in that capacity. He opened a bank account in the name of Howard Construction Company. Construction contracts were prepared and executed on behalf of Laurel by Shamy's father-in-law, wife and sister, and on behalf of Howard by Shamy's forging the name of Joseph Sage. Joseph Sage had experience in the construction business and acted as coordinator for work of the subcontractors on the Laurel construction project. Much later Shamy claimed that Sage had authorized him to sign the contract in Sage's name, but Sage denied having done so.[1]

The contracts provided for a fixed price of over $3,600,000 to be paid to Howard.

Construction began in the summer of 1976, but before Howard had incurred any expenses Shamy had Laurel issue a check to Howard for $25,000 on July 22 and another for $300,000 on July 29. Of the $325,000 thus acquired by Shamy from Laurel, he used $175,000 to reduce the officers' loans payable, an obligation which Rizk purportedly had assumed. This left a balance payable on those loans of $110,000 which was repaid in September 1976 after payments by Laurel to Rizk and Greta Shamy of $50,000 and $40,000, respectively, as salary, and to Shamy of $20,000 as a legal fee.

The Maryland Racing Commission required Maryland race tracks to publish financial statements prepared by Ernst & Ernst after an audit. Ernst & Ernst also did other accounting work for Laurel. In December 1976, Ernst & Ernst began its work on its audit for the twelve-month period ending September 30, 1976. When the auditors found the two July checks totaling $325,000 to Howard they requested production of the construction contracts. By a letter in January 1977, Shamy sent copies of the contracts to Ernst & Ernst and said that the $325,000 had been paid for site work done by Howard. In fact, the site work had not begun until several months after the two checks had been issued, and then it was performed by a subcontractor.

The auditors received word from another accounting firm that Shamy might have an interest in Howard. Three times they asked him about it. In response to the first inquiry Shamy wrote that he acted as general counsel for Howard. In response to the second inquiry, Rizk and Shamy signed a statement for inclusion in the audit report that Shamy served as general counsel for both Laurel and Howard Construction Company, but functioned in no other capacity for either and was not a stockholder in either. During a post-audit conference, Shamy told the auditors that Howard Construction Company was really Joe Sage. On two other occasions the Maryland Racing Commission was told that Joe Sage was the general contractor, once by Shamy and the other time by Mrs. Shamy. Shamy also told the stockholders that.

---

1. On cross-examination at trial, Sage admitted telling his lawyer that he was not sure he had never given such authorization, but that his lawyer told him that it was too late to change his testimony already provided the grand jury.

At the request of the auditors, Shamy produced a list of subcontractors. BBI Contractors and Advance Equipment Company were on the list. Neither of them had been on previous lists of contractors actually on the job which had been produced by other Laurel employees. According to the schedule Shamy produced, however, $229,000 had been paid to those two concerns and another $250,000 was owed to them. Actually, the $150,000 recorded on Laurel's books as having been paid to BBI had been sent directly to Commercial Trading Company for application to Brunswick Burlington's mortgage. The checks made payable to Advance Equipment Company had been laundered through an account of Advance Car Wash and cleared with checks payable to Shamy.

When the auditors sought independent confirmations from the subcontractors, Shamy delivered to them what purported to be unsigned confirmation letters from BBI and Advance Equipment. He claimed they had been delivered to Laurel and he was simply passing them on to the auditors. The auditors, however, insisted that they wanted independent confirmation sent directly to them. Shamy then informed them that they should contact Mike Cannella of BBI and Roger Boutros of Advance Equipment. Mike Cannella actually was an employee of Brunswick Burlington whose telephone number Shamy had given the auditors. Cannella was instructed to answer the telephone saying "BBI." Efforts to contact Roger Boutros were unsuccessful.

Though he had previously denied any connection with BBI or Advance Equipment, two days before a scheduled meeting with Maryland's Attorney General Shamy finally admitted that he did have a connection with them. He still insisted, however, that the two concerns were legitimate and had performed work at Laurel.

On March 8, 1978 the scheduled meeting with the Attorney General of Maryland and representatives of Ernst & Ernst was held. Mrs. Shamy and a lawyer attended. The Attorney General, informed of misrepresentations by Shamy to Ernst & Ernst, asked Mrs. Shamy to produce the books and records of BBI and Advance Equipment. She agreed to do that. On March 13, however, Mr. and Mrs. Shamy refused to produce them for inspection by Ernst & Ernst. Since Ernst & Ernst could not obtain those records, its December 31, 1977 report covering the preceding fifteen months, included a scope limitation note.

Early in 1979 Shamy, in an appearance before a federal grand jury in Maryland, produced files purporting to be those of Advance Equipment and BBI. The files contained bills which, like the subcontracts and confirmation letters, represented that BBI and Advance Equipment had performed specified work at Laurel which actually had been performed by legitimate subcontractors. Earlier, in May 1978, testifying as a witness in a civil suit in Maryland, Shamy swore that Advance Equipment and BBI were legitimate subcontractors who had done so much work at Laurel that they would make no profit on it.

In the schedules delivered by Shamy to Ernst & Ernst in February 1978, Shamy claimed aggregate overhead expenses for Howard in the amount of $497,917 and a profit of $403,432. Of course, the monies paid to and reportedly due BBI and Advance Equipment were included in the hard construction cost figures. Shamy refused to prepare a breakdown of his claimed overhead costs, claiming that it would put him to an unreasonable and highly burdensome amount of trouble. Later, in the Maryland civil suit, he testified that he had produced records for Ernst & Ernst which detailed and substantiated the claimed overhead expenses.

The trial was firm in unrebutted proof that Howard's overhead expenses could not have exceeded $57,000. During the construction process there had been two people at Laurel who were paid, at least in part, by Howard, but employees of Laurel handled all the administrative and clerical work. Howard had no office staff and incurred no housing or utilities expenses.

Reconciled, Shamy's profits in the name of Howard on the Laurel project substantially exceeded $1,200,000.

On August 1, 1977, Shamy drew $170,000 from Laurel, using $160,000 of it to pay interest on the Citizens Bank and Trust Loan.

In July and August 1977 the Shamys purchased an interest in the Mayflower Hotel in Atlantic City, New Jersey, using $250,000 drawn by Shamy on his construction contracts with Laurel. In December 1977 they sold a portion or most of that interest for $254,000. That money went to Mrs. Shamy's personal checking account from which she then "lent" $100,000 to Laurel and gave her father a check for another $100,000.

In November 1977 the FBI apparently was investigating the flow of money into Atlantic City. FBI agents sought from Ernst & Ernst information about Laurel which would be developed during the course of an audit for the fifteen month period ending December 31, 1977. The Maryland Racing Commission authorized Ernst & Ernst to cooperate with the FBI and, in a meeting in December, Ernst & Ernst agreed to obtain certain information for the FBI. There was no other meeting with the FBI until March 1978 when Ernst & Ernst took the position that it could not produce any of their working papers without a subpoena. Later the work papers were turned over to the government pursuant to a federal grand jury subpoena.

Ernst & Ernst did not immediately tell Shamy of the FBI's interest. Shamy contends that he did not know of it when he was supplying Ernst & Ernst with information about Howard, BBI and Advance Equipment in 1978. In a summary of the meeting of March 8, 1978 with the Attorney General of Maryland, Mrs. Shamy and her lawyer, prepared by one of Ernst & Ernst's accountants, there is a strong indication that she knew of it then. The lawyer was highly critical of Ernst & Ernst for having long delayed resolving what he described as the very minor problems of BBI and Advance Equipment. Mrs. Shamy is then said

to have expressed a belief that Ernst & Ernst had overreacted to a visit from the "big, bad FBI and got scared to complete the audit."

It was not until the stockholders meeting in May 1978 when the December 31, 1977 financial report was released that the minority stockholders of Laurel and the Racing Commission learned that Shamy was the owner of Howard, BBI and Advance Equipment.

Finally, in September 1978 Shamy negotiated a loan of $4.5 million from the National Bank of Washington, pledging Laurel's physical assets as security. With the proceeds of that loan, he paid off the $2.2 million borrowed by the acquiring stockholders from Citizens Bank and Trust and $1.2 million which had been borrowed by Laurel for use in the payment of construction costs. The remainder was used in the acquisition of stock from minority stockholders.

## II.

Shamy's defense was founded upon the provisions of the Maryland Code, see Md. Corp. & Ass'ns Code Ann. § 2–419 (1980 Cum.Supp.), which provides that a contract between a corporation and an interested party is not void or voidable solely for that reason if it is ratified by a majority of disinterested directors or if it is fair and reasonable.[2] For a time, Shamy's adroit lawyers seemingly persuaded the district judge that § 2–419 clothed the construction contracts between Laurel and Howard with complete legitimacy unless the United States could prove beyond a reasonable doubt that the contracts were unreasonable and unfair to Laurel. The statute expressly places the burden of proving fairness and reasonableness upon the party asserting the validity of the contract. But in the context of a criminal case, Shamy contended that the burden to prove unfairness and unreasonableness was upon the prosecution. We would have supposed the inherent unfair-

---

**2.** By its terms, the statute applies only to interested director transactions, but the district court found that the Maryland courts had applied it to contracts with other corporate employees and fiduciaries.

ness and unreasonableness would have been self-evident, but the trial judge worried, at least for a time, about the absence of affirmative proof that an independent construction company would have done the work for substantially less. In the end, however, the district judge concluded that a requirement of good faith was implicit in § 2–419.[3] Thus, he instructed the jury that it could not find the existence of a scheme to defraud unless it found that, at the time the construction contracts were executed, they were unreasonable and unfair to Laurel or that there was bad faith on Shamy's part at that time.

The inclusion of the bad faith component in the instruction is the basis of Shamy's principal contention on appeal. He finds no good faith requirement in § 2–419 and contends that without a finding that the construction contracts at the outset were unreasonable and unfair to Laurel, all of the evidence of Shamy's concealments and falsehoods, as well as the amount of his gain, was entirely irrelevant. Since the contracts were lawful under Maryland law, he contends that he had the legal right to do what he wished with the money flowing to him by reason of his lawful contracts.

Shamy simply misreads the statute.

Prior to 1976, the Maryland Code contained no such provision. There was a per se rule that any contract between a corporation and one of its directors or an entity in which the director had a substantial interest was void or voidable. Section 2–419 was enacted in that year to conform Maryland's law to that of most other states. The statute expressly provides that a contract is not void or voidable *solely* because of a common directorship or interest if the transaction is reasonable and fair to the corporation. There is no room for implication of the notion that the transaction may not be void or voidable for some other reason. Thus, Shamy was not disqualified from entering into a fair and reasonable construction contract with Laurel if there

had been frank and open disclosure of his interest and of all relevant data, including the amount, if any, of his anticipated profits. Through such open disclosure, all of the relevant facts and circumstances would have been communicated, not just to his wife, sister and father-in-law, but to minority stockholders as well. Section 2–419 simply cannot be read as supplanting § 2–405.-1(a).

### III.

██ In our view, the Maryland statutes were simply irrelevant in this case. We have held that a "scheme or artifice to defraud" within the meaning of the mail and wire fraud statutes is not limited to fraudulent schemes within the meaning of the common law or as prohibited by state law. It reaches deceptive schemes which are "contrary to public policy and conflict with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing." *United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir. 1979), *vacated on other grounds, United States v. Mandel*, 602 F.2d 653 (4th Cir. 1979) (*en banc*). Any breach of a fiduciary duty by a corporate employee effected in part by the use of the mails may be a violation of the federal mail fraud statute, at least when accompanied by concealment or a failure to disclose relevant and material information. *See United States v. Barta*, 635 F.2d 999, 1006–07 (2d Cir. 1980).

Even had it wished to do so, Maryland could not have immunized conduct violative of the federal mail and wire fraud statutes from prosecution in a federal court.

██ Though the instructions, insofar as they were based upon § 2–419, were erroneous, they suggest no need of a new trial. The submission of the question of good faith introduced the general concept of the mail and wire fraud statutes and it was substantially more favorable to the defense than the instruction would have been if it

---

**3.** Such a requirement is explicit in § 2–405.1(a). *See* Md. Corp. & Ass'ns Code, § 2–405.1 (1980 Cum.Supp.).

had been cast in the more traditional terms employed in mail fraud cases without reference to § 2–419. The jury was required to find bad faith on Shamy's part at the time the contracts were executed. Since the jury was also clearly required to find a scheme to defraud in order to convict, the jury clearly found every element of the offenses under instructions more favorable to Shamy than his entitlement.

## IV.

■ Shamy's lawyer suggests that he was taken by surprise by the inclusion of the bad faith component in the jury instructions and that he was confused by the shifting theories of the prosecution. When the prosecution rested, no defense was offered on Shamy's behalf. Defense counsel suggests that he might have made different tactical decisions if he had not been confused or misled.

Confusion was introduced into the trial, but it came from defense counsel's persistent insistence that the only triable issue was the reasonableness or unreasonableness and fairness or unfairness of the construction contracts at their inception. If, as it appears, he tentatively persuaded the trial judge, he scarcely is in a position to complain that the trial judge finally realized that he had been pressing for a submission to the jury on an issue which, at least in part, was irrelevant.

In seeking to support the admission of particular items of evidence, the prosecution did advance some novel theories, but this was in the face of defense counsel's objection that nothing was relevant except evidence going directly to the fairness and reasonableness of the construction contracts. The prosecution's theory was clearly stated in the indictment, and, except for statements during skirmishes over the admission of particular items of evidence, the prosecution adhered to that theory. There was no surprise or confusion affecting the fairness of the trial. The most that can be said is that defense counsel suffered the disappointment of not entirely succeeding in transferring the battle to ground of his own choosing.

## V.

■ Shamy complains of the introduction of evidence relating to several different matters, such as the payment of salaries and legal fees which were not shown by separate proof to have been unlawful, the purchase of an interest in the Mayflower Hotel in Atlantic City, and the application of funds derived from Laurel to interest payments on personal loans. But the prosecution was entitled to remove the curtain from the entire picture. Evidence of Shamy's need, and that of the controlling stockholders, for large sums of money, and the manner in which those funds were acquired were highly relevant to proof of the scheme to defraud charged in the indictment. Surprisingly, there is also a contention that proof of the payments to BBI and Advance Equipment was irrelevant since it is said there can be no such thing as "double billing" in the context of a fixed price contract. It is true that Shamy repeatedly stated that BBI and Advance Equipment had performed work which they had not performed and which had been performed by others, but the evidence came in not for the simple purpose of showing that more than one person had been paid for doing the same work but to show Shamy's persistent attempt to conceal his own profit. That concealment is highly relevant to the proof of the scheme.

## VI.

■ Shamy next complains that the introduction of evidence obtained by Ernst & Ernst during the course of its audit was a violation of his Fifth Amendment privilege against self-incrimination.

Most of the information obtained by Ernst & Ernst during the course of the audit was derived from corporate records. Neither a corporation nor its officers have a privilege not to have corporate records disclosed, for the privilege is purely a personal one. *See Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). Shamy, however, did produce information

about Howard and about BBI and Advance Equipment. The information he produced was laced with falsehoods, but Shamy did have a privilege against governmental compulsion to produce it. He contends that the auditors were acting as governmental agents in questioning him about his financial affairs and about the things he had done in the names of Howard, BBI and Advance Equipment.

The FBI's interest in the audit and the auditors' guarded cooperation with the FBI did not affect the scope of the audits. Justifiably, Ernst & Ernst became suspicious of Shamy. An inquiry in search of information to support or justify earlier statements by him was necessary to completion of a full and complete statement of Laurel's financial affairs. Nor did the Maryland Racing Commission's requirement of an annual audit by independent accountants as a condition for licensing constitute impermissible governmental compulsion. Shamy's reliance on *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), is misplaced.

In *Gardner* it was held that a public official or employee may not be discharged for refusing to sign a waiver of any immunity to which he is entitled when questioned about his official conduct. Evil was perceived in the absolute requirement of a formal waiver of immunity before the questioning began. The court made it explicitly clear, however, that such a person, who is not asked to waive his immunity before testifying or responding to questioning, may be discharged for refusing to answer, even though his refusal to answer is based upon a claim of his Fifth Amendment privilege against self-incrimination. *See* 392 U.S. at 278, 88 S.Ct. at 1916. Here, no one sought a waiver of immunity by Shamy. The Racing Commission's requirement that licensed race track operators submit to an annual audit is like a local government requiring public employees to respond to questions about their official conduct. *See Pinkney v. District of Columbia*, 439 F.Supp. 519, 532–34 (D.D.C.1977). In highly regulated industries, regulatory agencies may, indeed must, insist upon complete financial reporting to them as a condition of continued licensing.

■ Shamy's claim of privilege cannot prevail for another reason. He did not claim it. He insists that he could not be found to have waived his privilege when he did not know of the interest of the FBI in the audit. There is an indication that he knew of their interest early in March, but he surely knew of the interest by the Racing Commission and that financial statements required by the Racing Commission would be filed with it and other officials of Maryland as public documents.

■ Nor was Shamy entitled to *Miranda* warnings, *see Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), or to a warning that the FBI had contacted the auditors about its interest in Shamy's affairs. *See Hoffa v. United States*, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414–415, 17 L.Ed.2d 374 (1966); *United States ex rel. Milani v. Pate*, 425 F.2d 6 (7th Cir. 1970). Shamy's reluctant cooperation with the auditors was voluntary.

### VII.

We find nothing in Shamy's contention that the relevant mailings in the mail fraud counts were not sufficiently closely related to his scheme to defraud to bring his conduct within the statute.

Since we found no other basis for reversal, the convictions on all counts of this faithless servant who covertly enriched himself at the expense of the corporation to which he owed his loyalty are affirmed.

*AFFIRMED.*