**Deominia D'IORIO, Plaintiff,**

**v.**

**Angelo J. ADONIZIO, et al., Defendants.**

**Civ. A. No. 82–0735.**

United States District Court,
M.D. Pennsylvania.

Dec. 30, 1982.

Robert P. Casey, Dilworth, Paxon, Kalish & Kauffman, Scranton, Pa., for plaintiff.

Patrick J. O'Connor, Cozen, Begier & O'Connor, Philadelphia, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

### I. Factual and Procedural Background

On June 10, 1982, the plaintiff, Deominia D'Iorio, filed a complaint in six counts by which she seeks to recover damages suffered as a result of allegedly fraudulent transactions involving the various defendants. In count one of the complaint, the plaintiff invokes the jurisdiction of this court pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. §§ 1961, et seq.), 18 U.S.C. § 1964(a) and (c), as well as 28 U.S.C. § 1331. Treble damages are sought. Counts two through six are pendent state claims which allege causes of action for wrongful appropriation of business opportunities, breach of fiduciary duties, civil conspiracy, fraudulent concealment, and breach of contract.

Various individuals and business entities are named in the complaint. They can be

described briefly as follows: The defendant, Adonizio Brothers, is a Pennsylvania corporation engaged in the operation of a quarry. The plaintiff, her sister Yolanda Saporito, and the individual defendants Angelo Adonizio, Charles Adonizio, James Adonizio, Patrick Adonizio, Jr., Peter V. Adonizio and Samuel P. Adonizio constituted all the shareholders of Adonizio Brothers, Inc.[1] Defendant Addy Asphalt Company is a Pennsylvania corporation engaged in general construction work. The plaintiff and the individual defendants are the sole shareholders of the Addy Asphalt Company. The defendant Addy Construction Company is a general partnership consisting of the plaintiff and the individual defendants. The business of the Addy Construction Co. is to lease equipment to Adonizio Brothers, Inc. and the Addy Asphalt Company. The defendant Wilkes Equipment Company is a partnership consisting of the individual defendants. The business of Wilkes Equipment Company is, allegedly, to lease equipment to Adonizio Brothers, Inc. and the Addy Asphalt Company.

In the first count of her complaint, the plaintiff alleges three separate claims which she contends are within the ambit of RICO. First, she alleges that the individual defendants defrauded her by forming the Wilkes Equipment Company, without her knowledge, to appropriate business opportunities available to the business entities of which she was a partner or shareholder. She alleges that from January of 1971 through March of 1979 Wilkes purchased various pieces of equipment. This equipment was then rented to Adonizio Brothers, Inc. and Addy Asphalt at rates which, over the rental period, substantially exceeded the purchase price. To bring this claim within the purview of RICO, the plaintiff has alleged that the scheme involved use of the mails, including mailing of partnership

withdrawals, disbursements, financial statements, invoices, etc.

The plaintiff has alleged, as part of the first count, a second scheme involving the purchase of Addy Asphalt common stock. According to the complaint, shares of Addy common stock made available by the death of Adam Petrillo, a shareholder, were never made available to the plaintiff or to Addy Asphalt Company for purchase. Instead, the complaint alleges, the individual defendants purchased this stock themselves. Again, various uses of the mails and wires are alleged, including the reciprocal mailing of payment in return for the shares of stock purchased.

Finally, in connection with the first count of the complaint, the plaintiff alleges that the individual defendants defrauded her by paying themselves excessive salaries from Adonizio Brothers, Inc. and Addy Asphalt Company. Use of the mails in forwarding salary payments is alleged.

The pendent state claims have the same factual core as the federal claims.

A motion to dismiss the complaint was filed by the defendants on July 1, 1982, and, after having been granted an extension of time for the filing of a supporting brief, a brief was filed by the defendants on July 30, 1982. The plaintiff filed an opposing brief with appendices on August 17, 1982, and a reply brief was filed on August 31, 1982. By order of September 14, 1982, we allowed the defendants until September 30, 1982, to file supplemental briefs in support of their motion to dismiss.[2] A supplemental brief was filed by the defendants on September 30, 1982, and a response was filed by the plaintiff on October 7, 1982. Defendants filed a reply brief on October 22, 1982. Various letters from counsel have also been filed of record.

---

1. Patrick Adonizio, Jr. is deceased, and his estate has been named a party defendant. Henceforth the term "individual defendants" shall refer to the individuals named including Joseph Saporito, apparently not a shareholder of Adonizio Brothers, Inc.

2. This was permitted, because, at a pretrial conference held on September 13, 1982, counsel for defendants expressed his desire to address the legal effect of plaintiff's voluntary withdrawal of several lawsuits pending in Luzerne County Court of Common Pleas. The existence of these suits had formed the basis of defendants' abstention argument.

## II. The RICO Claims

Because our jurisdiction in this case hinges on the cognizability of the plaintiff's RICO claims, we must first address the defendants' various challenges to the validity of these claims. Plaintiff has invoked federal jurisdiction pursuant to 18 U.S.C. § 1964(a) and (c):

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons. . . .

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Section 1962 of Title 18, United States Code, provides, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of invest-ment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under the subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(a)–(c).

■ Thus, there are several discrete prerequisites for an individual to maintain a RICO claim: the affiliation of a defendant with an enterprise engaged in or affecting interstate commerce, and the involvement in or conduct of the enterprise through a pattern of racketeering activity. *See United States v. Vignola,* 464 F.Supp. 1091 (E.D. Pa.), *aff'd,* 605 F.2d 1199 (3d Cir.1979), *cert. denied* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980).

### A. "Pattern of Racketeering Activity"

One of the thorniest problems raised in connection with the instant motion stems from the phrase "pattern of racketeering activity." "Racketeering activity" is defined, in pertinent part, as follows: "any

act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). "Pattern of racketeering activity" is further defined as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The plaintiff contends that the activities alleged constitute mail and/or wire fraud as defined in 18 U.S.C. §§ 1341 and 1343 and as such constitutes the "pattern of racketeering activity" required by RICO. Defendants, on the other hand, argue that even accepting the plaintiff's allegations as true, their conduct did not meet the definition of mail or wire fraud and that, in any case, RICO was never intended to be so broad in scope as to encompass the activities described.

■ Because it appears from the allegations of the complaint that the use of the mails is the most significant as going to a "pattern of racketeering activity" we will begin by discussing the requisite elements of mail fraud as they relate to the facts in this case. Mail fraud is defined as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any

post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or things, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.[3] The phrase "for the purpose of executing such scheme or artifice or attempting to do so" has been extensively construed both by the United States Supreme Court and by the court of appeals for this circuit. The decisional law in this regard is succinctly summarized by Judge Sloviter in the case of *United States v. Lebovitz,* 669 F.2d 894 (3d Cir.) *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982):

Whether a mailing is "for the purpose of executing a scheme" within the meaning of § 1341 depends upon whether it is "sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Brown,* 583 F.2d 659, 664 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). The completion of the scheme must depend in some way on the mailings charged. *United States v. Brown,* 583 F.2d at 664; *United States v. Tarnopol,* 561 F.2d 466, 472 (3d Cir.1977). However, "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), *quoted* in *United States v. Maze,* 414 U.S. at 400, 94 S.Ct. at 648. Rather, it is sufficient if the mailing is

**3.** Wire fraud requires that "wiretaps, signs, signals, pictures or sounds" be transmitted "by means of wire, radio or television communication in interstate or foreign commerce" for the purpose of executing a scheme or artifice to defraud. 18 U.S.C. § 1343. The mail and wire fraud statutes have been held to be *in pari*

*materia* so that cases construing one apply equally to the other. *United States v. Giovengo,* 637 F.2d 941, 944 (3d Cir.1980), *cert. denied* 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981); *United States v. Tarnopol,* 561 F.2d 466 (3d Cir.1977).

"incident to an essential part of the scheme." *Pereira v. United States,* 347 U.S. at 8, 74 S.Ct. at 362. *See United States v. Adamo,* 534 F.2d 31, 36 (3d Cir.), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976) ("It is enough that the use of the mails merely furthers the scheme. . . ."); *United States v. Giovengo,* 637 F.2d 941, 944–45 (3d Cir.1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981) (applying *Pereira* test to wire fraud statute).

669 F.2d at 896.

To resolve the matter before us it is necessary to flesh out the principles cited by Judge Sloviter by examining in detail the facts of several of the more important cases. In *Pereira v. United States, supra,* for example, the defendant defrauded his wife of $35,000 with which he absconded. Pereira persuaded his wife to sell certain securities to help finance a hotel venture. She received a check for the proceeds from a Los Angeles bank, which she gave to Pereira. Pereira endorsed the check for collection to a bank in El Paso, Texas. When the check cleared, a cashier's check for $35,000 was drawn in his favor. The court in *Pereira* found a mail fraud since the mails played a significant role in enabling the defendant to obtain the money with which he absconded.

More recently, in *United States v. Maze, supra,* the Court found use of the mails insufficiently related to the fraud to constitute a violation. The defendant in *Maze* stole his roommate's car and his Bank Americard and then proceeded to charge items and services purchased from various motels in different states to the credit card. The invoices were mailed from the vendors to the bank in Louisville, Kentucky which had issued the card. The Court distinguished *Pereira:*

Unlike the mailings in *Pereira,* the mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and Meredith, all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

414 U.S. at 402, 94 S.Ct. at 649, 38 L.Ed.2d at 609. The Court went on to comment that

Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice . . . ." Since the mailings in this case were not for that purpose, the judgment of the Court of Appeals is affirmed.

414 U.S. at 405, 94 S.Ct. at 651, 38 L.Ed.2d at 611.

In this circuit, the case of *United States v. Tarnopol,* 561 F.2d 466 (3d Cir.1977) instructively addresses the issues raised in *Pereira* and *Maze.* In *Tarnopol,* the defendants were charged with mail fraud in connection with a scheme by which the officers of two record companies failed to report $350,000 worth of record sales in the corporate books. The proceeds from these unreported sales were used as payoffs to certain individuals (disc jockeys and radio program directors) who could secure favored treatment for the companies' recordings. This, the Government contended, amounted to a fraud on the United States (IRS), those who were entitled to royalty payments based on sales, and the listening public who were thereby deprived of the honest service of radio station employees. The use of the mails alleged was the mailing of a "packing slip" from the record manufacturer to the record companies in connection with each shipment received. Upon receipt, the slips representing those sales to be placed on the books would be passed on to the billing department while those which were not to be reported would

be retained by one of the defendants in his desk. The court said that the crucial relationship between the mailings and the scheme turned not "on time or space but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." *Id.* at 472 (citation omitted.) The court elaborated:

Thus, mailings taking place after the object of the scheme has been accomplished, or before its accomplishment has begun, are not sufficiently closely related to the scheme to support a mail fraud prosecution. Nor are routine mailings required by law which are themselves intrinsically innocent even though they take place during the course of carrying out a fraudulent scheme, the objective of which is the embezzlement of funds received in response to the mailings. We do not believe that there is a valid distinction to be drawn between those routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise. In either case the mailings themselves are not sufficiently closely related to the fraudulent scheme to support a mail fraud prosecution even though securing the funds received through some of them is the object of the scheme to defraud....

*Id.* at 472 (citations omitted). The court found that the confirmation slips insufficiently related to the fraudulent scheme to support a conviction for mail fraud. In the later case of *United States v. Brown,* 583 F.2d 659 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) the court noted that *Tarnopol* did not create a broad "routine business mailing" exception, but rather applied the established rule that mailings too remote from the fraudulent scheme will not support a mail fraud conviction. *Id.* at 667.

In the case of *United States v. Giovengo,* 637 F.2d 941 (3d Cir.1980) *cert. den.,* 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981), the defendants were convicted of violations of the federal wire fraud statute (18 U.S.C. § 1343). The defendants, ticket agents for TWA, would order tickets for airline customers through a computer which was linked to interstate telephone circuits. The defendants then manipulated the various receipts attached to the ticket in such a way as to enable them to reconstruct the ticket in entirety once the passenger had exchanged it for a boarding pass. The defendants would mark the ticket void and return it to the TWA accounting office. Because the ticket had been voided, accounting would not look for a corresponding cash amount. Defendants would then pocket the cash the passenger had paid for the ticket. The court distinguished *Tarnopol* and *Maze:*

In Paladino's case, by contrast, resort to interstate wires was "essential" rather than convenient to the scheme in question, inasmuch as the computer link up was necessary in order to print the tickets sold to TWA passengers. Whereas the court in *Tarnopol* could compare the case before it to *Maze* and conjecture that "it would appear that the fraud would have been better served if no packing slips had been in existence." [A] similar analysis cannot logically apply to the present case. If Paladino and Giovengo had had no access to the TWA computer system, they would have had no tickets to sell, and their plan to defraud the airline could never have succeeded.

Id. at 945.

◼ The application of these legal principles to the facts before us is difficult, and we regard this as a close case. The fraud alleged as to the plaintiff appears to be predicated on a breach of fiduciary duty including the wrongful siphoning off of business opportunities and assets.[4] The

---

4. The phrase "scheme or artifice to defraud" has been given a broad rather than narrowly technical construction. In *United States v. Shamy,* 656 F.2d 951 (4th Cir.1981) *cert. de-*

*nied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 the court said:

[A] "scheme or artifice to defraud" within the meaning of the mail and wire fraud statutes is not limited to fraudulent schemes

mailings upon which federal jurisdiction appears to rest, however, do not pertain to the plaintiff. That is, it does not appear from the face of the complaint that any of the mailings or phone calls charged were directed to her. Rather, the communications alleged appear to be among the named defendants and third parties. Although these mailings may have been classified as "routine" business mailings, it is impossible to determine their precise nature in the absence of a record. Even if the mailings were routine or intrinsically innocent, it seems to us that they would be sufficient to support the alleged mail fraud if they were instrumental in setting into motion the mechanisms by which the plaintiff claims she was defrauded. The case is somewhat analogous to *United States v. Kent,* 608 F.2d 542 (5th Cir.1979) *cert. denied* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). In *Kent* it was alleged that the defendants fraudulently acquired property of Union Oil which they then put to use:

> Kent allegedly paid Smith [an employee of Union Oil] to provide geological data, investment recommendations, and other confidential information, and then transmitted it to Patrick Petroleum, Robinson, and Meeks. Patrick Petroleum, Robinson, and Meeks allegedly used the purloined data to obtain leases for Patrick Petroleum, through hired real estate brokers in those areas where Union Oil had acquired or was seeking to procure leases.

*Id.* at 544. The defendants would then attempt to sell part interests in the leases to Union Oil and to others. The appeals court, reversing the district court, found the documents mailed sufficient to support a charge of federal mail fraud:

> The fraudulent scheme involving the acquisition and use of Union Oil's property charged in the indictment in this case

could be found dependent on the documents mailed: the instructions mailed to real estate brokers to enter particular leases, the payments mailed to those brokers for services, the commissions and royalty assignments mailed indirectly to Kent to obtain the stolen data, and the offer mailed to Union Oil to sell it a part interest. These mailings were not incidental to the scheme if the materials mailed were integral to the plan's execution.

*Id.* at 546. Similarly, in the instant case, use of the mails in the establishment and operation of Wilkes Equipment Company, the referenced stock purchase, and the payment of excessive salaries may well have been an integral part of the scheme to defraud. Thus, for the time being, in the absence of a record, we conclude that a sufficient pattern of racketeering has been alleged. Naturally, this issue may be subject to redetermination on the basis of the use of the mails and wire which can actually be proven.

**B. Scope of RICO**

■ We turn now to the next jurisdictional hurdle. That is, was RICO meant to encompass the type of fraud alleged, which the defendants have characterized as the common "garden variety." In a nutshell, the defendants contend that RICO should be narrowly interpreted and should not be used to federalize cases which traditionally would be brought as civil actions in state court. As we construe the argument, we are required to take cognizance of RICO's legislative purpose and therefore read into the act by implication the requirement that a RICO defendant be somehow linked to organized crime. Defendants draw support for their position principally from the recitation of RICO's legislative history in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) and from

within the meaning of the common law or as prohibited by state law. It reaches deceptive schemes which are "contrary to public policy and conflict with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing . . . ." Any breach of a fiduciary duty by a corporate employee

effected in part by the use of the mails may be a violation of the federal mail fraud statute, at least when accompanied by concealment or a failure to disclose relevant and material information.

*Id.* at 957 (citations omitted).

the cases of *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109 (S.D.N.Y.1975); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736 (N.D.Ill.1981); and *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256 (E.D.La.1981).

In *Barr,* the court held that a telephone answering service charged with violations of the Sherman Act and of price control regulations was not a proper defendant under the Organized Crime Control Act (18 U.S.C. § 1961, et seq.):

> An examination of the legislative history of the Act convinces us that the Act was not intended to create a private right of action upon facts such as those alleged here. The legislative history makes frequent references to "racketeers," "organized crime" and "organized crime families" as well as the "syndicate," "Mafia" and "Cosa Nostra." It is clear that it was aimed not at legitimate business organizations but at combating "a society of criminals who seek to operate outside of the control of the American people and their governments." There is no question that defendants cannot be so characterized.

66 F.R.D. at 113. Similarly, in *Adair,* the court refused to find a land fraud action brought against developers within the reach of RICO:

> In the present case there is no suggestion that defendants have engaged in a pattern of criminal racketeering. Indeed, there is not even any allegation of that matter. What is alleged is securities and land fraud of the type traditionally litigated in private civil actions. Similarly, there is no assertion that defendants are engaged in organized crime, or any activity of a similar nature. Hence, in this

case, the dismissal of the civil RICO count is not "unacceptable" in terms of effectuating the "declared purpose" of the Act. 526 F.Supp. at 753. Finally, in *Waterman* the court concluded

> that the history of the statute reveals a clearly expressed legislative intent that RICO should apply only to actions involving organized crime activities and not to everyday civil actions ... involving private litigants with no relation to organized crime.

527 F.Supp. at 260.

■ We do not find the defendants' arguments or the rationale of the above-cited cases persuasive. Although we acknowledge that the Supreme Court in *Turkette* noted that RICO's purpose was the improvement of the tools through which the eradication of organized crime could be accomplished, *see* 452 U.S. at 588–91, 101 S.Ct. at 2531–32, 69 L.Ed. at 256–57, the precise holding of the case is simply that both legitimate and illegitimate enterprises fall within the ambit of RICO. Thus, the case really broadened, rather than narrowed, the applicability of RICO. Further, by requiring a nexus with organized crime we would be attempting to further Congress' legislative intent by ignoring its legislative language.[5] A nexus with organized crime is not required by criminal or civil RICO. This has been acknowledged by a variety of courts. *See, e.g., United States v. Aleman,* 609 F.2d 298 (7th Cir.1979) *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Vignola,* 464 F.Supp. 1091 (E.D.Pa.), *aff'd.,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (Criminal); *Hellenic Lines, Ltd. v. O'Hearn,* 523 Supp. 244 (S.D.N.Y.1981);

---

**5.** We believe the clear language of the statute has been ignored by courts which have sought to restrict the application of RICO by other means. For example, in *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207 (N.D.Ill., 1980), the court added a requirement that a civil plaintiff allege that a "competitive injury" resulted from a RICO violation, thus imposing an artificial standing requirement. A similar standing requirement was announced in *Spencer Cos. v. Agency Rent-A-Car, Inc.,* Fed.

Sec.L.Rept. (CCH) ¶ 98, 361 (D.Mass. Nov. 17, 1981) where the court suggested that in lieu of alleging competitive injury a plaintiff could allege that it was a legitimate enterprise infiltrated through a pattern of racketeering activity. Other approaches have also been suggested but all seems to us to limit unjustifiably the broad reach of the statute which amounts to nothing less than judicial amendment of the legislative language.

*Engl v. Berg,* 511 F.Supp. 1146 (E.D.Pa. 1981) (Civil). Requiring a nexus with organized crime would be of doubtful constitutionality and would in most cases impose an insuperable barrier to our jurisdiction in RICO matters.

While we may agree that RICO, as drafted, in many ways "swallows up" common law fraud, it is not for us to restrict the clear language of the statute. In this regard, we agree with the author of the Note, *Civil RICO—The Temptations and Impropriety of Judicial Restrictions,* 95 Har.L. Rev. 1101 (1982):

> Courts should not be left to impose liability based on their own tacit determination of which defendants are affiliated with organized crime. Nor should they create standing requirements that would preclude liability in many situations in which legislative intent would compel it. Complaints that RICO may effectively federalize common law fraud and erode recent restrictions on claims for securities fraud are better addressed to Congress than to courts.

*Id.* at 1121. The cases cited by the defendants from courts in this circuit do not compel or even suggest a different result. For example, in the case of *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981), the court did no more than to require a series of unlawful acts (more than one) to establish a "pattern of racketeering activity" as defined in the statute. The court in *Erlbaum v. Erlbaum,* No. 80–4245 (E.D.Pa. July 13 1982), for example, required that a RICO plaintiff do more than establish that an injury was caused by a "pattern of racketeering activity." The court required allegation and proof that the injury result from the activities of an infiltrated enterprise. That is, that "The 'pattern of racketeering activity' must be related to obtaining an interest in an enterprise or operating an enterprise." Slip Op. at 8. Even were we to apply the *Erlbaum* test to the case at bar, the allegations of the com-

plaint would be sufficient (assuming, once again that a pattern of racketeering activity is established.)

### C. Nexus with Interstate Commerce

█ Naturally, as the defendants correctly point out, it is necessary for the plaintiff to allege and prove that the "enterprises" or business entities involved were engaged in or affect interstate commerce. The defendants contend that the plaintiff has not made this crucial allegation, and that, therefore, federal jurisdiction does not lie. It is true that the allegation has not been made and that it is a requisite to jurisdiction. Plaintiff argues, however, that facts have been pleaded such as would permit the inference of interstate commerce. We believe this is true, particularly in light of the rather minimal criteria for finding a nexus with interstate commerce. We believe that it is proper to plead the connection with interstate commerce expressly but, because this can easily be accomplished by amendment, we do not believe the failure to plead this fact initially is fatal to our jurisdiction.[6]

### D. Summary of Jurisdictional Conclusions

We briefly recapitulate our decision on the jurisdictional issues before proceeding further. We hold that the allegations of the complaint are sufficient to establish a "pattern of racketeering activity" as required by RICO, that the acts complained of fall within the ambit of RICO and that there has (or will be) sufficient allegation that the named enterprises are engaged in or affect interstate commerce. We have determined that we have jurisdiction to consider the remaining issues.

### E. Statute of Limitations

█ We first consider whether the action is, as defendants have suggested, barred by the applicable statute of limitations. Because RICO does not contain a statute of limitations, courts have looked to the most analogous state statute. The defendants

---

**6.** This defect may be cured by the filing of the amended complaint attached as Exhibit "A" to

the motion to dismiss.

urge that the most analagous state statute, in view of RICO's treble damage provisions is Pennsylvania's one year limitation imposed on "an action upon a statute for a civil penalty or forfeiture" 42 Pa.C.S.A. § 5523(2). Plaintiff has alleged that she did not learn of the alleged fraud until August of 1979. The complaint in this matter was filed on June 10, 1982. Hence, the defendants argue, the RICO action is time barred. Alternatively, the defendants urge that we apply the two year limitation on the initiation of a prosecution for corrupt organization found at 42 Pa.C.S.A. § 5552, to the same effect. The plaintiff, on the other hand, argues that the six year limitation period for fraud is applicable.[7]

▮ Upon analysis, we conclude that an action for fraud is the state cause of action most analogous to the present RICO claim. Despite the treble damage feature, we do not believe that the instant private cause of action can be properly classified an action for a civil penalty or forfeiture. *See, e.g., State Farm Fire and Casualty Co. v. Estate of Caton,* 540 F.Supp. 673 (N.D.Ind., 1982), *Prudential Lines, Inc. v. McKeon,* No. 80–5853 (S.D.N.Y., April 21, 1982). Nor can we agree that the limitation period for commencement of a prosecution for corrupt organization under Pennsylvania law is applicable. Although the Pennsylvania Corrupt Organizations Act, 18 Pa.C.S.A. § 911 bears a resemblance to federal RICO, the act does not on its face appear to create a private cause of action for money damages as RICO does. Further, should the civil enforcement provisions be construed to include such a remedy, we would still decline to apply the *criminal* statute of limitations to which defendants have directed us.

▮ In conclusion, from a reading of RICO and a consideration of its purposes, in light of the facts alleged, we consider the six year statute of limitations for common law fraud as the most analogous and most appropriate. The jurisdictional underpinnings of this case require pleading and proof of federal mail and wire fraud, both of which depend upon the existence of a scheme or artifice to defraud. It is clear to us that the six year limitation should be applied and, based on the August, 1979 discovery date, we find the RICO claims to be timely filed.[8] Because the cause of action alleged occurred in Pennsylvania, we decline to apply a Florida statute of limitations to bar the claim against the Estate of Patrick Adonizio, Jr. We will also deny the motion to dismiss based on defective service. It appears that the personal representative of the estate was served with the complaint by mail as permitted by statute. The error lies in naming the estate, rather than the personal representative as a party defendant. This can be cured by amendment.[9]

### F. "Enterprises" as Defendants

▮ Defendants argue that the four named business entities may not properly be named defendants pursuant to RICO. In other words, although both a "person" and an "enterprise" are requisite, the enterprise exists only for jurisdictional purposes and only the "person" may be a defendant. In support of their position defendants cite the case of *Parnes v. Heinhold Commodities, Inc.,* 548 F.Supp. 20 (N.D.Ill., 1982). In *Parnes,* the court expressed concern that low level corporate "malefactors" could "thrust treble damage liability on a wholly unwitting corporate management and shareholders." At p. 22. Although we can-

---

**7.** 42 Pa.C.S.A. § 5527 provides, at subsection (6) for a six year limitation on "Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation)." This limitation applies to common law fraud. *See, e.g., Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981) *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648.

**8.** Naturally, this issue may be reopened depending upon what is revealed by discovery.

**9.** This defect is also cured in the proposed amended complaint, which we will direct the plaintiff to file.

not be sure in the absence of a record, it does not appear that the concerns of the *Parnes* court are pertinent to the case before us. It is true, as the *Parnes* court observed, that one of the purposes of RICO is to protect infiltration of legitimate enterprises through a pattern of racketeering activities. In such a case, the enterprise may be properly classified as a victim. However, the allegations of this case suggest that various enterprises were operated by their directors and controlling partners, through a pattern of racketeering activity, to the detriment of a third party. In such a case, the business entities named may properly be named as defendants as well as jurisdiction-conferring enterprises. In accord is the recent case of *United States v. Hartley,* 678 F.2d 961 (11th Cir.1982).

### III. Pendent Jurisdiction

 Finally, we consider our jurisdiction over the pendent state claims. In the initial motion to dismiss, the abstention issue was extensively briefed because of the pendency of two Luzerne County actions concerning essentially the same issues. On August 24, 1982, the state actions were discontinued. The defendants argue that we should not assume pendent jurisdiction over the state claims since the plaintiff voluntarily abandoned on the eve of trial a forum in which her state claims could be expeditiously adjudicated. Although we may question the prudence of plaintiff's abandonment of her state actions, her decision to hazard all on the instant case does not effect our determination of pendent jurisdiction. Pendent jurisdiction exists where the federal claim is substantial enough to confer jurisdiction and where the state and federal claims derive from a "common nucleus of operative fact" such that a plaintiff would be expected to try them all in one judicial proceeding. *United Mineworkers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed. 218, 228 (1966). The *exercise* of pendent jurisdiction is in the discretion of the court and is influenced by "considerations of judicial economy, convenience and fairness to litigants." Id. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228. We

conclude that the state and federal claims derive from a common factual nucleus and that the exercise of pendent jurisdiction is otherwise appropriate. We will, therefore, retain jurisdiction over the plaintiff's state claims.

An appropriate order will be entered.